IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

KENNETH ALLEN AND WIFE,
MINNIE ALLEN                                                                               PLAINTIFFS

VS.                                                          CIVIL ACTION NO. 2:09cv70KS-MTP

REGIONS BANK AS SUCCESSOR
OF FIRST AMERICAN NATIONAL
BANK, OPERATING AS DEPOSIT
GUARANTY NATIONAL BANK,
A FOREIGN CORPORATION, AND
UNION SECURITY LIFE INSURANCE
COMPANY, A FOREIGN CORPORATION                                              DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a Motion to Compel Arbitration and To Stay All Proceedings filed by Defendant Regions Bank ("Regions"), as Successor of First American National Bank, Operating as Deposit Guaranty National Bank [Doc. #9] and joined in by Defendant Union Security Life Insurance Company ("USLIC")[Doc. #16]. The Court, having reviewed the Motion, the various responses and replies, all matters made a part of the record of this case as well as applicable law, and thus being fully advised in the premises, finds that the Motion **should be denied**. The Court specifically finds as follows:

## I. BACKGROUND

On October 7, 1999, Kenneth and Minnie Allen entered into a loan agreement with First American National Bank ("First American"), operating as Deposit Guaranty, in the amount of

1

$54,219.51, which was secured by a deed of trust. At the time the loan was made, First American reserved $5,177.32 and $7,042.19 to be held in trust by the bank to purchase disability insurance and credit life insurance, respectively.[1] (Compl. ¶ 3 [Doc. #1].) In December 1999, AmSouth became the legal successor to First American. In November 2006, Regions became the legal successor of AmSouth.

Between the time of the loan and the current action, the Allens opened and maintained two other accounts with AmSouth. On or about January 31, 2001, the Allens opened a Demand Deposit Account, and on or about February 13, 2007, Minnie Allen along with Cameron Allen opened a second Demand Deposit Account.[2] (Def's Mot. to Compel Arbitration, Ex. A at 12-13 [Doc. #9-2].) For both accounts, the Allens signed a signature card expressly binding them to the terms of the AmSouth Customer Agreement ("AmSouth Agreement") which contained the following arbitration agreement:

> ARBITRATION. Any controversy, claim, or dispute between us (or between you and any of our employees, agents, representatives, parent or affiliated companies, or any of their employees) shall be settled by arbitration as set forth below. Such arbitration shall include, without limitations, any dispute or controversy regarding or pertaining in any way to any of the following: (a) this Agreement; (b) the Account; (c) any charge or cost incurred under this Agreement or the Account; (d) the collection of any amounts due under this Agreement or the Account; (e) any contract or alleged tort related to or arising out of your business or relationship with us; and (f) any statements or representations made to you.

---

[1] The loan agreement is not before the court; however Plaintiffs did provide a copy of the Disclosure/ Settlement Statement, Pls' Resp. to Mot. to Compel Arbitration, Ex. B. [Doc. # 23-2], which lists "Principal amount of new loan[s]," "Credit Life Reserved by Bank," and "Disability Reserved by Bank." Neither party has alleged that the 1999 loan agreement contained an arbitration agreement.

[2] Although this second account was opened after AmSouth's merger with Regions, the account was opened with an AmSouth signature card.

(Def's Mot. to Compel Arbitration, Ex. A1-A3 [Doc. #9-3, 9-4, 9-5].) Upon the merger of AmSouth and Regions, Regions amended the AmSouth account terms through the Regions Deposit Agreement, which was mailed to account holders as a part of the Regions Consumer Disclosure Booklet ("Regions Agreement"). This agreement, effective as of October 26, 2007, contained this revised arbitration agreement:

> ARBITRATION AND WAIVER OF JURY TRIAL. Except as expressly provided below, you and we agree that either party may elect to resolve by BINDING ARBITRATION any controversy, claim, counterclaim, dispute, or disagreement between you and us, whether arising before or after the effective date of this Agreement (any "Claim"). This includes, but is not limited to, any controversy, claim, counterclaim, dispute or disagreement arising out of, in connection with or relating to any one or more of the following: (1) the interpretation, execution, administration, amendment or modification of the Agreement; (2) any account; (3) any charge or cost incurred pursuant to the Agreement; (4) the collection of any amounts due under the Agreement or any account; (5) any alleged contract or tort arising out of or relating in any way to the Agreement, any account, any transaction, any advertisement or solicitation, or your business interaction or relationship with us; (6) any breach of any provision of the Agreement; (7) any statements or representations made to you with respect to the Agreement, any account, any transaction, any advertisement or solicitation, or your business, interaction, or relationship with us; or (8) any of the foregoing arising out of, in connection with or relating to any agreement which relates to the Agreement, any account, any transaction or your business, interaction or relationship with us.

(Def's Mot. to Compel Arbitration, Ex. A4 [Doc. #9-6 at 33].)

In 2004, after suffering severe heart problems, Mr. Allen requested disability coverage under the loan's disability insurance policy, but AmSouth denied the existence of the coverage. In 2008, Mr. Allen again contacted Regions and the insurer, USLIC, to request coverage under his disability policy after being diagnosed with a cancerous condition. Regions and USLIC denied the existence of the insurance policy and refused to pay. (Compl. ¶¶ 4-7 [Doc. #1].)

Plaintiffs filed a Complaint in this Court on April 9, 2009, seeking actual and punitive

damages, asserting that Regions' and USLIC's failure to pay benefits under the loan's disability insurance constituted breach of trust, fraud and misrepresentation, breach of contract, and bad faith. [ Doc #1]. On June 8, 2009, Regions filed a Motion to Compel Arbitration, arguing that the loan fell within the scope of the arbitration clause contained in the Regions Agreement. [Doc. #9]. USLIC joined this motion on June 18, 2009. [Doc. #13]. In their rebuttal, the Allens allege that there is no valid binding arbitration agreement covering the parties' dispute over the loan insurance under the terms of either the AmSouth or Regions Agreements. (Pls.' Resp. in Opp'n to Def.'s Mot. to Compel 5 n.1 [Doc. # 23].) Because the AmSouth and Regions Agreements do not unambiguously modify the loan agreement, the Court finds that the parties did not agree to arbitrate a claim arising under the loan agreement, and thus arbitration should not be compelled.

## II. APPLICATION AND ANALYSIS

Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, provides that where a party has refused to arbitrate under a written arbitration agreement, the other party may petition the court for an order compelling arbitration, and the court shall order the parties to arbitrate if it is satisfied that the making of the agreement is not in issue.[3]

A two-step analysis is applied to determine whether a party may be compelled to

---

[3]The FAA applies to all transactions "involving commerce." *See* 9 U.S.C. §§ 1,2. Defendant Regions Bank extended credit to Plaintiffs. "No elaborate explanation is needed to make evident the broad impact of commercial lending on the national economy or Congress' power to regulate that activity pursuant to the Commerce Clause." *Citizens Bank v. Alafabco*, 539 U.S. 52, 58 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003). The court therefore finds (and none of the parties disagree) that the loan agreement in this dispute has a nexus to interstate commerce and the FAA applies.

4

arbitrate. *Sherer v. Greentree Serv.*, 548 F.3d 379, 381 (5th Cir. 2008) (*citing J.P. Morgan Chase & Co. v. Conegie*, 492 F.3d 596, 598 (5th Cir. 2007). First, we ask if the party has agreed to arbitrate the dispute. *Id.* If so, we then ask if "any federal statute or policy renders the claims nonarbitrable." *Id.* (*quoting Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 263 (5th Cir. 2004)). That first step itself contains two questions: (1) is there a valid agreement to arbitrate the claims and (2) does the dispute in question fall within the scope of that arbitration agreement. *Id.* These questions are decided according to state law. *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004) (*quoting Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996)). "While there is a strong federal policy favoring arbitration, the policy does not apply to the initial determination whether there is a valid agreement to arbitrate." *Id.* (*citing Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003)); *see also Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989) ("[T]he FAA does not require parties to arbitrate when they have not agreed to do so."). "Nonetheless, once a court determines that an agreement to arbitrate exists, the court must pay careful attention to the strong federal policy favoring arbitration and must resolve all ambiguities in favor of arbitration." *Banc One,* 367 F.3d at 429 (citations omitted). Neither party contends that a federal statute or policy precludes enforcement of the arbitration clause. Therefore, our analysis focuses on whether the parties have agreed to arbitrate the dispute.

**1. BECAUSE THE VERY EXISTENCE OF A VALID BINDING ARBITRATION AGREEMENT IS AT ISSUE, IT IS WITHIN THE COURT'S PROVINCE TO DETERMINE WHETHER AN AGREEMENT WAS REACHED.**

5

Despite Regions Bank's argument that an arbitrator, not the court, should determine whether the claim is arbitrable, in this instance the issue is a matter for the courts. Generally, it is for the courts to decide the question of arbitrability, absent clear and unmistakable evidence that the parties agreed to arbitrate the question of arbitrability. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) (*citing AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986)). "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute (citations omitted), so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *Id.* at 943. "Where the very existence of any agreement is disputed, it is for the courts to decide at the outset whether an agreement was reached, applying state-law principles of contract." *Will-Drill Res., Inc. v. Samson Res., Co.*, 352 F.3d 211, 218 (5th Cir. 2003); *see also Regions Bank v. Herrington*, No. 4:09cv32TSL-LRA, 2009 WL 1851018 at *3 n.2 (S.D.Miss. June 26, 2009) ( "[Plaintiff]'s position, however, as the court understands it, is that there was never any Customer Agreement between him and Regions, which in the court's view presents an issue for this court, not the arbitrator."). In *Will-Drill Resources*, the court explained that:

> ... where the very existence of an agreement is challenged, ordering arbitration could result in an arbitrator deciding that no agreement was ever formed. Such an outcome would be a statement that the arbitrator *never* had any authority to decide the issue. A presumption that a signed document represents an agreement could lead to this untenable result. We therefore conclude that where a party attacks the very existence of an agreement, as opposed to its continued validity or enforcement, the courts must first resolve that dispute.

*Will-Drill Res.*, 352 F.3d at 219.

Regions argues that the applicability– not the existence– of the arbitration agreement is

6

at issue, and that the arbitrator, and not the court, should decide the issue of arbitrability. Regions bases this argument on the provisions within the AmSouth and Regions Agreements that require arbitration of the arbitrability of a claim ("*First Option* clauses").[4] However these clauses only apply to the Allens' loan if they are a part of a valid contract, and the court has the job of deciding whether a valid contract was formed under controlling state law. While many of the Allens' arguments in reply focus on the scope of the arbitration agreements in both the AmSouth and Regions Agreements, the Allens urge the Court to follow the Mississippi Supreme Court's holding in *Quimby* and find that no valid binding arbitration agreement exists in the loan contract between the parties. *AmSouth Bank v. Quimby*, 963 So.2d 1145 (Miss. 2007). For the reasons set forth below, we find that the loan agreement is not subject to a valid binding arbitration agreement or the *First Options* clauses therein.

## 2. BECAUSE THE AMSOUTH AGREEMENT DID NOT MODIFY THE LOAN CONTRACT, THE ARBITRATION CLAUSE THEREIN DOES NOT APPLY TO THE LOAN CLAIM FOLLOWING THE MISSISSIPPI SUPREME COURT'S HOLDING IN *QUIMBY*.

Plaintiffs contend that *Quimby*, which involved similar circumstances, should control and bar arbitration. *See id.* (denying motion to compel arbitration). Quimby had an AmSouth loan (originally made with Deposit Guaranty in 1985) and two separate AmSouth checking

---

[4]The AmSouth Agreement's Arbitration Provision provides: "*Any disagreement as to whether a particular dispute or claim* is subject to arbitration under this paragraph shall be decided by arbitration in accordance with the provisions of this paragraph." (emphasis added) [Doc. #9-5 at 4]. The Regions Agreement provides: "Any dispute regarding whether a particular controversy is subject to arbitration, including any claim of unconscionability *and any dispute over the scope or validity of this agreement to arbitrate disputes or of this entire Agreement*, shall be decided by the arbitrator(s)." (emphasis added) [Doc. #9-6 at 34].

7

accounts (both opened in the 1980s with predecessors of AmSouth). *Id.* at 1146 & n.2.  He alleged that after his June 2000 disability, AmSouth failed to pay disability benefits under a credit disability insurance plan purchased with the loan. *Id.* at 1146.  The court denied AmSouth's motion to compel arbitration. *Id.* at 1148.

First, the court held that the arbitration agreement in AmSouth's March 2000 Customer Agreement (the agreement in effect at the time of the accrual of the claim) was not applicable to the loans, only to deposit accounts, because the March 2000 Agreement applied only to a narrow set of accounts. *Id.* at 1152.  The Agreement's cover page purported to cover only deposit accounts and the Agreement defined "account" as "any type of account to which funds may be deposited." *Id.* at 1151.

The *Quimby* court rejected AmSouth's argument that since the predating agreement contained a *First Options* clause, an arbitrator should decide whether the claim should be arbitrated. *Id.* at 1154.  The court said that "[s]ince the March 2000 Customer Agreement, by its own terms, did not cover Quimby's line of credit account, no revised Customer Agreement predating Quimby's disability claim required the question of arbitrability to be submitted to an arbitrator." *Id.*  In other words, the court was not looking at the scope of the arbitration agreement, but looking instead at whether the new terms in the Customer Agreement applied to the loan contract.

Next, the court determined that the March 2004 Customer Agreement was not applicable to loans by its terms, and additionally, could not apply retroactively to Quimby's pre-existing claim. *Id.* at 1152.  The March 2004 Agreement extended the definition of "account" to include CDs, IRAs and time deposits, but did not purport to cover loans. *Id.* at 1151.

8

Therefore, the loan agreement was not modified at all. Also, since the arbitration clause did not contain express retroactive language and the original agreement in 2000 did not say amendments would be retroactive, the arbitration clause would not apply. *Id.* at 1152. "Here, the arbitration provision contained neither language that was broad enough to cover events which predated the contract's execution, nor language which would broaden its application by containing terms such as 'applies to all transactions occurring before or after execution' or 'all transactions between us' or 'all business with us.'" *Id.* (*quoting B.C. Rogers Poultry Inc. v. Wedgeworth*, 911 So.2d 483, 489 (Miss. 2005)). " Where such clause exists, a legal basis to apply the arbitration clause retroactively may exist." *Id.*

Finally, the court considered AmSouth's final revision of account terms in its October 2004 Customer Agreement. AmSouth argued that the October 2004 Agreement's arbitration clause language was broad enough to cover any transaction between the bank and the customer. *Id.* at 1150. Here, "account" was defined to include a "business relationship of any nature whatsoever you may hold from time to time with any of us." *Id.* The court did not reach this issue, however, because the modification was not in effect until 2004, four years after Quimby's cause of action accrued, and the October 2004 Agreement, like the March 2004 Agreement, did not contain specific, retroactive language. *Id.* at 1154.

Since the Allens' claim allegedly arose in 2004 when AmSouth first denied the existence of the credit disability insurance coverage, the AmSouth Agreement predates the cause of action and retroactivity language would not be necessary. Regardless, the AmSouth Agreement is inapplicable to the cause of action by its terms and express coverage. Here, as in the March 2000 Customer Agreement in *Quimby*, the AmSouth Agreement applies narrowly by

9

its terms to deposit accounts only.[5] The agreement states that "[t]his agreement covers the use of any type of depository account you have with us, both personal and nonpersonal, except for time deposits, certificates of deposit, and IRAs." ([Doc. # 9-5 at 3].) AmSouth stated specifically which accounts should be covered by these terms, and loans were not included. Therefore, the loan agreement here was not modified by the terms in the AmSouth Agreement, and is not subject to the arbitration agreement or *First Options* clause therein. Therefore, Regions cannot compel arbitration based on the AmSouth Agreement terms.

### 3. BECAUSE THE REGIONS AGREEMENT IS AMBIGUOUS AS TO ITS APPLICABILITY TO THE LOAN AGREEMENT, THE ARBITRATION CLAUSE THEREIN DOES NOT APPLY TO THE LOAN CLAIM UNDER BASIC CONTRACT CONSTRUCTION RULES.

While the *Quimby* court did not consider Customer Agreements subsequent to the accrual of the cause of action, the post-claim Regions Agreement contains appropriate retroactive language. The Regions Agreement states: "ARBITRATION AND WAIVER OF JURY TRIAL. Except as expressly provided below, you and we agree that either party may elect to resolve by BINDING ARBITRATION any controversy, claim, counterclaim, dispute or disagreement between you and us, *whether arising before or after the effective date of this Agreement* (any "CLAIM")." (emphasis added) [Doc. # 9-6 at 33]. This language satisfies the *Quimby* requirements that the language of the agreement expressly refer to claims before and after the terms offered, and so the Agreement can be retroactively applied. The Allens argue that the language should not apply retroactively, because Regions failed to include its

---

[5]In fact, it appears that *Quimby*'s March 2000 Agreement is the exact same document as the AmSouth Agreement in this case.

predecessors in its definition of "us." However, Regions' definition of "us" includes "Regions Bank" and since Regions is the legal successor, all liabilities of the previous corporation are vested in the survivor.[6] This language is therefore sufficient to retroactively affect prior agreements.

The Court then, under *Quimby,* must determine if the post-claim amendment modifies the loan agreement. "Waiver [of the right to file a lawsuit in court] presupposes full knowledge of a right existing, and an intentional surrender or relinquishment of that right." *Union Planters Bank, National Association v. Rogers*, 912 So.2d 116, 119 (Miss. 2005). "It contemplates something done designedly or knowingly, which modifies or changes existing rights or varies or changes the terms and conditions of a contract." *Id.* In *Rogers*, the Mississippi Supreme Court determined that a valid contract was not formed when the provisions in a mail-out conflicted with provisions in an arbitration agreement. *Id.* at 120. The court held that:

> The use of basic contract construction rules also leads us to the conclusion that the Rogerses were not bound by Union Planters' arbitration provision. A cardinal rule of construction of a contract is to ascertain the mutual intentions of the parties. *Miss. Transp. Comm'n v. Ronald Adams Contractor, Inc.*, 753 So.2d 1077, 1084 (Miss.2000). Intent should first be sought in an objective reading of the words employed in the contract. *Id.* We find that the general provisions of the mail-outs and the specific provisions of the arbitration clause are in conflict (i.e., the general provisions require "use" of the account only, whereas the specific provisions of the arbitration clause require "use" of the account and the execution of a signature card), causing ambiguity. Ambiguities in a contract are to be

---

[6]This is true under the laws of both Mississippi and Alabama, where Regions is a chartered banking institution. See Miss. Code. Ann. § 79-4-11.07(a)(1-4) ("When a merger becomes effective, the corporation . . . that is designated in the plan of merger as the survivor continues . . .; [t]he separate existence of every corporation or other entity that is merged into the survivor ceases; [and] ... [a]ll liabilities of each corporation or other entity that is merged into the survivor are vested in th survivor... ."); Ala. Code. Ann. § 10-2B-110.06 (3)("The surviving corporation shall be responsible and liable for all the liabilities and obligations of each corporation party to the merger...").

> construed against the party who drafted the contract. *Id.* at 1085. And specific language controls over general inconsistent language in a contract. *Id.* Construing the ambiguities against Union Planters, the drafter of the contract, we find that the specific provisions of the arbitration clause supplant the general provisions.

*Id.*

At first glance, the Regions Agreement appears to modify loan accounts which would subject the loan dispute to its arbitration provisions. In the Agreement's cover letter Regions states, "Please see the enclosed Consumer Disclosure Booklet for the terms and conditions and pricing that will apply to your accounts in Louisiana, Mississippi and Tennessee as of October 26, 2007." [Doc. #9-6 at 2]. The Regions Agreement later defines 'account' broadly when the term relates to binding arbitration to cover "any account or other business relationship of any nature whatsoever you may hold or have held from time to time with any of us." [Doc. #9-6 at 18]. Further the Regions Agreement states that "[a]ny BINDING ARBITRATION provisions set forth in this Agreement also apply to any account, contract, *loan*, transaction... you may have or have had with us from time to time." (emphasis added) [Doc. # 9-6 at 18]. Because of these statements, Regions believes there can be no doubt that the arbitration provisions in the Regions Agreement apply to the loan dispute.

However, the Regions Agreement when read with the accompanying mail-out is not so clear as to its coverage. The mailing accompanying the Consumer Disclosure Booklet says: "For the terms and conditions, fee schedules, and interest rate tiers that will apply to Regions *deposit* accounts in Louisiana, Mississippi and Tennessee as of October 26, please see the enclosed Consumer Disclosure Booklet." (emphasis added) [Doc. #9-6 at 4]. This statement is repeated on the next page under the heading "YOUR NEW CONSUMER DISCLOSURE BOOKLET." suggesting that this booklet will only apply to deposit accounts. [Doc. #9-6 at 7].

12

Further, the mailing states:

> *CONSUMER LOANS*
> ☐ These accounts will continue with the *same terms and conditions*.
> ☐ If you use a loan coupon book to make your payments, please continue to use your existing coupon book.
> ☐ *If you have credit insurance or debt protection on your account, this coverage will continue with the same benefits, rates, and terms*.

(emphasis added) [Doc. #9-6 at 7]. The cover of the Consumer Disclosure Booklet lists "Deposit Agreement," "Agreement and Disclosure Statement for the Use of ATM Cards, Debit Cards and CheckCards," "Personal, Private Banking And At Work Checking, Money Market, Savings, And IRA Accounts (Pricing Schedule)," and "Regions Bank Premium Line Agreement" as its contents. [Doc. #9-6 at 16]. The newly broadened definition of 'accounts' is found in the section of the agreement labeled "Deposit Agreement." [Doc. #9-6 at 18]. In other words, it is only after around twenty-five pages of the mailing and several statements to the contrary that Regions informs its customers that some of the terms within the fifty-nine page Consumer Disclosure Booklet apply to loan accounts. At several places the mail-out specifies that the enclosed terms apply only to deposit accounts and specifically excludes consumer loans, despite the arbitration provision to the contrary which states that the arbitration terms apply to loans.

While the ambiguity in *Rogers* involved what events would cause the terms of the agreement to apply, the ambiguity here is whether the terms of the agreements apply at all to the loan contract. Because the document is ambiguous as to what accounts it purports to modify, basic rules of statutory construction lead us to conclude that the loan agreement cannot be held subject to the terms of the Regions Agreement, including the arbitration provision therein, when the ambiguities are construed against Regions as the drafter.

13

Regions argues that finding the entire agreement inapplicable violates *Prima Paint*. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967). *Prima Paint* held that the court "may consider only issues relating to the making and performance of the agreement to arbitrate." *Id.* at 404 (holding that "making" of agreement to arbitrate was not called into question by general allegation that entire contract was void because of fraudulent inducement). *See id.* at 403-04 . "[I]f the claim is fraud in the inducement of the arbitration clause itself- an issue which goes to the 'making' of the agreement to arbitrate- the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Id.* at 403-04. In other words, the *Prima* doctrine requires that an arbitrator address defenses that the contract as a whole is void or voidable, but does not require arbitration of the issue of whether an agreement to arbitrate was made. *See also Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 430 (5th Cir. 2004) *(citing Will Drill Res.*, 352 F.3d at 218) ("*Will-Drill* distinguished the far more common argument made by a party who does not challenge the existence of a contract, but rather attacks the enforceability of the agreement alleging that the contract is *void ab initio* or voidable. Such a scenario calls for application of the severability doctrine contained in *Prima Paint*."). This is admittedly a fine line. *See Will-Drill Res.,* 352 F.3d at 212 (reserving issue of contract formation to court, not arbitrator, when less than all of the parties signed agreement) ; *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d. 1069, 1077 (5th Cir. 2002) (allowing court, not arbitrator, to determine if children were bound by parents' signature on contract) ; *but see Primerica Life Ins. Co. v. Brown,* 304 F.3d 469, 472 (5th Cir. 2002) (submitting defense of capacity to arbitrator); *AmSouth Bank v. Bowens,* 351 F. Supp.2d 572, 575 (S.D.Miss. 2005)

(submitting defense of forgery to arbitrator); *American Bankers Ins. Co. of Florida v. Milsap*, 350 F.Supp.2d 730, 734 (S.D.. Miss. 2004) (submitting defense of procedural unconscionability to arbitrator).

Here, the basic gateway issue is whether an agreement to arbitrate was ever formed. While there is little doubt that an arbitration agreement was made for the deposit accounts, the Regions Agreement is simply too ambiguous to find that both parties mutually assented to modify their loan agreement to include the arbitration terms. The parties do not dispute that there is a valid loan agreement; instead the issue is whether the modifications containing the arbitration agreements were made a part of the loan agreement. Because the ambiguity calls into question the very 'making' of the arbitration agreement and is not a defense to the overall loan agreement, *Prima Paint* does not mandate arbitration of this issue.

Regions also argues that the Court should follow the federal policy favoring arbitration. "Despite the federal policy favoring arbitration, our courts are required to submit to arbitration only what the parties agreed to submit to arbitration." *Adams v. Greenpoint Credit, LLC*, 943 So.2d 703, 708 (Miss. 2006) (*citing AT & T Technologies, Inc. v. Communications Worker's of America*, 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1996)). Here, the issue is not the scope of the arbitration agreement, but rather the initial determination of whether the parties mutually assented to modify the loan agreement to include the terms of the Regions Agreement, so the federal policy favoring arbitration would not apply.

**4. CAN THE VALID, BROAD ARBITRATION CLAUSE IN THE CHECKING ACCOUNT AGREEMENT EXTEND TO CONTROVERSIES ARISING UNDER THE SEPARATE LOAN CONTRACT?**

The Regions Agreement does unambiguously modify the Allens' two checking accounts, forming a valid, binding agreement to arbitrate for these separate accounts. The Allens signed signature cards for their deposit accounts with AmSouth, knowingly and voluntarily submitting to the terms of the AmSouth Customer Agreement,[7] including an arbitration clause and the terms of amending the agreement.[8] The Regions Agreement changed the terms of these accounts, and the Allens accepted these new terms by maintaining their accounts with the bank, conducting transactions, and allowing electronic access to one of the accounts.[9] The Regions Agreement modified and superceded all prior agreements.[10] Therefore

---

[7] " By signing below, I also: (a) agree to be bound by the terms of the Bank's customer agreement, rules and regulations, and pricing schedule, as now in force and as amended from time to time hereafter, related to each account or service listed below; (b) acknowledge receipt of a copy of the applicable customer agreement and pricing schedule now in effect; [and] (c) promise that all information on this form is true." AmSouth Signature Card [Doc. #9-3]. "By signing a signature card . . . when you open your account, by conducting any transaction involving your account, or by maintaining your account after receipt of this agreement, you agree to the terms in this agreement." AmSouth Customer Agreement for Depository Accounts, Regions Motion to Compel Arbitration, Ex. A-3 [Doc. #9-5].

[8] "AMENDMENT OF CUSTOMER AGREEMENT. We can change the customer agreement including pricing schedule and the charges on your account, at any time. Before a change is made, we will mail you notice of the change to any address shown on our records or make the notice available with the periodic statement of your account." "By continuing to maintain your account, you agree to the changes." AmSouth Customer Agreement for Depository Accounts, Regions Motion to Compel Arbitration, Ex. A-3 [Doc. #9-5].

[9] "**Acceptance Of This Agreement.** By signing a signature card when you open an account, by signing any signature maintenance card or other account document for an account, by depositing funds into, or withdrawing funds from, any account, by being named as a beneficiary or joint owner by an existing owner of an account, by using an account with us, or permitting anyone else to get access to your account through any of our electronic banking services, or by maintaining an account after our sending or providing to you by any reasonable means (including but not limited to: by mail to the mailing address we have for you on our records; by e-mail to the e-mail address we have for you on our records; by making available or publishing on our official web site at http://www.regions.com or any subsequent official Regions Bank web site; or by making publicly available at any of our locations at the time you open or modify an account) this Agreement of any amendment(s) to his Agreement or by your receipt of

16

the two deposit accounts are undoubtedly subject to the arbitration clauses contained in the Regions Agreement. Most importantly the two deposit accounts are subject to the *First Options* clause and the broad arbitration provisions.

Regions urges that we follow the holding in *AmSouth Bank v. Steadman,* 339 F.Supp. 2d 778 (S.D. Miss. 2004), and find that the provisions of any validly formed agreement between the bank and its customer, even for a separate and distinct account, can provide the basis for arbitration. In *Steadman*, the court compelled arbitration of the issue of arbitrability of a claim involving a certificate of deposit ("CD") account because the customer's checking account contained a *First Options* clause, even though the checking account agreement expressly excluded CDs. *Steadman*, 339 F. Supp.2d at 781. The *Steadman* court viewed this as a question of scope and thus favored the strong federal policy to enforce arbitration agreements. *Id.* Conversely, the Mississippi Supreme Court in *Quimby* did not apply the broad arbitration clause in the March 2000 Agreement that undoubtedly modified Quimby's checking accounts because the agreement did not by its terms modify the loan agreement.[11] *Quimby*, 963 So.2d at 1154. As discussed above, this case presents a contract formation issue, and this Court is bound

---

the same by any means, <u>you agree to the terms of this Agreement, as amended</u>. Our agreement with you includes this Agreement, our pricing schedule, funds availability policy as posted, and any supplemental provisions we print concerning your account, which are applicable. All these documents together are a contract between you and us." Regions Deposit Agreement at 18-19 (emphasis added) [Doc. #9-6].

[10]"46. **Entire Agreement; Other Programs And Services.** …This Agreement constitutes the current and entire general deposit agreement between you and us with respect to the account(s) for which this Agreement has been delivered, and any and all prior general deposit agreements with respect to such account(s) are superceded by this Agreement…." [Doc. #9-6 at 37].

[11]It appears that the *Steadman* and *Quimby* courts were analyzing the same AmSouth agreement.

to follow *Quimby* and Mississippi law.

Some Mississippi cases have applied an arbitration clause in one contract to cover controversies that arise under separate contracts between the same parties. *See, e.g., Doleac v. Real Estate Professionals*, *LLC*, 911 So.2d 496, 504 (Miss. 2005) ("[U]nder general principles of contract law, separate agreements executed contemporaneously by the same parties, for the same purposes, and as part of the same transaction, are to be construed together."); *Swindle v. Harvey*, No. 2008-CA-00560-COA, WL 1758840 at *4 (Miss. App. June 23, 2009) ("[W]hen evaluating the intention of the parties, the individual documents entered into contemporaneously should be considered integral and interrelated parts of a single global transaction, and as such, all should be construed together"). In *Pennzoil,* the Fifth Circuit applied an arbitration clause from a general development agreement which established oil and gas development relationships between several entities to disputes arising from subsequent contracts between some of the general agreement parties. *See Pennzoil Exploration and Production Company*, 139 F.3d 1061, 1067 (5th Cir. 1998) ("Broad arbitration clauses... are not limited to claims that literally 'arise under the contract,' but rather embrace all disputes between the parties having a significant relationship to the contract regardless of the label attached to the dispute."). In *Pennzoil*. the court found that the parties intended for the general contract and the smaller contracts to be considered as one. *See id.* at 1068 ("In addition to being related to the same overriding goal, the agreements themselves evidence their inter-relationship."). However, the *Pennzoil* court recognized that even broad clauses have limits. *Id.* at 1067 n.8 ("We realize that even broad clauses have their limits. Because we are concerned only with the dispute before us and its connection with or relation to the several agreements before us, we

need not explore these outer limits,"). In *PaineWebber,* the Fifth Circuit declined to apply the arbitration clauses from three Option Agreements to a dispute arising under a separate Referral Agreement. *Paine Webber, Inc., v. Chase Manhattan Private Bank*, 260 F.3d 453, 464 (5th Cir. 2001). "Certainly, the extremely broad language of these clauses, if read in a vacuum, would appear to bind the parties to arbitrate any and all disputes that may arise between them. When read in context as they must be, however, the reach of the arbitration clauses in the Option Agreements is simply not capable of such an expansive grasp." *Id.* (holding that Option Agreements were limited in time and scope and in no way modified or superceded Referral Agreement).

Here, the loan and checking account agreements do not have the same degree of relatedness as found between the *Pennzoil* contracts. The checking contracts and the loan contract were formed at different times over many years and were entered into for different purposes. Regions and its predecessors have demonstrated an intent to keep the terms of the loan and checking account agreements separate through limiting language in mail-outs and modifications. These accounts lack a common goal as in the *Pennzoil* contracts, and instead are limited in scope, more like the *Paine Webber* agreements. The claim in this case did not arise under "any other relationship with us" generally, but under an entirely separate, specific contract, one that is not present before the court today. Therefore, this Court concludes that the loan agreement would not be subject to a valid arbitration agreement in a completely separate account. To hold otherwise allows a "back door" approach to contract modification that violates the basic contract principals of mutual assent between parties to a contract. Therefore, the broad arbitration agreement in the checking accounts does not provide a basis to compel

arbitration for issues arising under the separate and independent loan agreement.

## 5. USLIC CANNOT COMPEL ARBITRATION AS A NON-SIGNATORY WHEN THE SIGNATORY CANNOT

USLIC, a non-signatory to the contract, cannot compel arbitration of the claim for all of the reasons discussed above.

## III. CONCLUSION

IT IS, THEREFORE, ORDERED AND ADJUDGED that the Defendants' motion to compel arbitration [Doc. #9] is **denied.**

SO ORDERED AND ADJUDGED on this, the 10th day of September, 2009.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE